IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KIRRELL TAYLOR,

        Plaintiff,                     No. CIV S-05-1412 GEB KJM P

    vs.

MIKE KNOWLES, et al.,

        Defendants.             FINDINGS & RECOMMENDATIONS

                              /

        Plaintiff is a state prison inmate proceeding pro se with a civil rights action under 42 U.S.C. § 1983, alleging that the defendants failed to protect him after a broadcast of the program "America's Most Wanted" said that he provided information about his co-perpetrator to authorities and that, as a result, he was attacked by a razor-wielding inmate on July 12, 2004.

        Defendants and plaintiff have filed cross-motions for summary judgment.

I. Standards For Summary Judgment Motions

        Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

/////

/////

1

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

On January 10, 2006, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

II. Factual Background

    A. Defendants' Version of the Facts

In 2004, plaintiff was housed in the Enhanced Outpatient (EOP) unit in A-Facility of California State Prison, Sacramento. Defendants' Motion For Summary Judgment (DMSJ), Declaration of J. Johnson[1] (Johnson Decl.) ¶¶ 3, 5; Declaration of Michael Sichler (Sichler Decl.) ¶ 5. A-Facility is a protective custody unit, housing inmates with "sensitive needs," such as gang drop outs, mental health patients, or others who might be targeted in general population. Declaration of Michael Vasquez (Vasquez Decl.) ¶ 8. The EOP unit in A-Facility is a mental health unit, where the inmates are given regular contact with counselors and psychiatrists. Johnson Decl. ¶ 6. Defendant Gaerlan, a psychologist, was plaintiff's case manager, who met weekly with plaintiff and coordinated plaintiff's treatment. Declaration of Alvin Gaerlan (Gaerlan Decl.) ¶¶ 4-5.

On or about March 20, 2004, the television show "America's Most Wanted" aired an episode that included information about plaintiff's crime and suggested that plaintiff had identified his crime partner to the police. The next day, other inmates told plaintiff about the broadcast. Plaintiff's Motion For Summary Judgment (PMSJ), Declaration of Kirell Taylor (Taylor Decl.) ¶¶ 2-3.[2]

On March 22, 2004, plaintiff had a routine appointment with defendant Frishman, a staff psychiatrist in the EOP program. Declaration of Richard Frishman (Frishman Decl.) ¶¶ 6-7. Plaintiff told Frishman he was concerned because the America's Most Wanted broadcast had claimed plaintiff had informed against his crime partner and said, "I don't know who I'm going to have to stab . . . I'm worried someone is coming after me . . . This is no light matter . . . I can't

---

[1] For ease of reference, the court will describe the declarations by the name of the declarant, rather than by their exhibit letter.

[2] This is hearsay, but defendants have not objected to it or otherwise contested the contention that the broadcast labeled plaintiff a "snitch."

4

sleep." Id. ¶ 7 & Attach. 2 (Progress Notes). Defendant Frishman's notes describe plaintiff as "paranoid he will be focus of an attack." Id. Defendant Frishman avers that plaintiff suffers from a delusional disorder and often described incidents with no basis in reality. In the past, plaintiff had told Frishman he had millions of dollars buried in Southern California and he had personally attempted to stop the September 11, 2001 terrorist attacks. Id. ¶ 8. Frishman initially believed that this account of America's Most Wanted was another delusion. Id. Frishman concedes that plaintiff "expressed concern with the airing of the . . . program" but was "unable to point to a specific safety threat." Id.

Plaintiff had a regular weekly meeting with defendant Gaerlan on March 24, 2004. Gaerlan Decl. ¶ 7. Plaintiff said that other inmates and guards told him the broadcast characterized him as an informant. Gaerlan describes plaintiff's demeanor as "upset" and "angry and embarrassed" but said plaintiff did not express any safety concerns. Id. ¶ 7 & Attach. 2 (Progress Notes). Defendant Gaerlan confirmed plaintiff's account by talking to correctional officers who had seen the show, which in fact had claimed plaintiff had turned against his co-perpetrator. Id. ¶ 8 & Attach. 2.

Defendant Johnson was a correctional lieutenant in charge of the EOP in A-Facility during March and April 2004. Johnson Decl. ¶ 3. On March 30, 2004,[3] Johnson interviewed plaintiff in order "to evaluate Taylor's status following a televised program of Americas Most Wanted (AMW) that featured him and his commitment offense." Id. ¶ 8 & Attach. 1. Plaintiff told Johnson that the show had "inaccurately portrayed him as an informant against his crime partner," but that he felt safe in A-Facility because it "does not play politics." Id. ¶¶ 9-10 & Attach. 1.[4]

---

[3] The declaration gives the date as March 30, 2006, an apparent typographical error. The court deems the correct date to be March 30, 2004, based on other information in the record.

[4] Attachment 1 to the Johnson Declaration is a memorialization of the interview of March 30. It notes that plaintiff had approached defendant Kennedy about obtaining a letter from the District Attorney. Defendant Kennedy, however, describes her meeting with plaintiff

5

Defendant Gaerlan had another meeting with plaintiff on March 30. Plaintiff reported he had spoken with the facility captain and counselor[5] about the broadcast. Plaintiff wanted to ensure that the information was documented. Gaerlan Decl. ¶ 9 & Attach. 3.[6]

On March 31, 2004, plaintiff asked to see defendant Kennedy, who was a correctional counselor for the A-Facility EOP unit until May 3, 2004. Declaration of Patricia Kennedy (Kennedy Decl.) ¶¶ 3-4. Plaintiff asked Kennedy to contact the District Attorney's office and secure a letter affirming that he had not been an informant in the co-perpetrator's case. Id. ¶ 5. Plaintiff said he would need the letter if he were moved to B or C Facility, but agreed that general population inmates might not consider such a letter credible. Id. ¶ 6. He also told her that he did not have safety concerns in A-Facility, but thought he would be in danger if he were transferred to B or C Facility. Id. ¶ 7. Kennedy confirmed that defendant Johnson had interviewed plaintiff the night before and that plaintiff had not expressed any safety concerns to Johnson. Accordingly, Kennedy took no steps to move plaintiff to another facility. Id. ¶ 8.

On April 1, 2004, plaintiff had a Unit Classification/Interdisciplinary Treatment Team (UCC/IDTT) meeting to consider whether he should remain in EOP or transfer to another unit or prison. Kennedy Decl. ¶ 9. Plaintiff agreed with the recommendation that he remain in EOP. Id., Attach. 1; Gaerlan Decl. ¶ 11 & Attach. 4. Gaerlaen's notes reflect, however, that Captain Vance had assigned someone "to address the issue of possible safety concern" as a result of the broadcast. Gaerlan Decl., Attach. 4 (notes of 4/1/04).

Plaintiff continued to meet with defendant Gaerlan and occasionally said he was depressed about the broadcast. Id. ¶ 12 & Attach. 5. According to Gaerlan's declaration,

---

as occurring on March 31, after plaintiff met with Johnson. Declaration of Patricia Kennedy (Kennedy Decl.) ¶ 5.

[5] See note 4 supra.

[6] In his declaration, Gaerlan claims that plaintiff expressed no concerns about his safety on the EOP unit; this is not reflected in the progress notes. Compare Gaerlan Decl. ¶ 9 & Attach. 3.

plaintiff never said he was in any danger. According to the progress notes of April 5, 2004, however, plaintiff told Gaerlan, "Someone is after me and wants me to die"; also on April 19, 2004, plaintiff told Gaerlan that "he believes there is someone who wants him dead, but he doesn't know who," though this person might have been a correctional officer. Compare Gaerlan Decl. ¶ 12 & Attach. 5 (notes of 4/5/04 & 4/19/04). In addition, plaintiff met with defendant Frishman on three other occasions before July 12, but did not express any concerns for his safety. Frishman Decl. ¶ 9 & Attach. 3.

Defendant Sichler replaced defendant Kennedy as correctional counselor in the EOP unit on May 3, 2004. Sichler Decl. ¶ 3. Plaintiff did not tell Sichler he had any concerns about his safety. Sichler learned of the America's Most Wanted broadcast only after plaintiff was attacked on July 12. Id. ¶¶ 6, 8.

On June 21, 2004, staff determined that plaintiff's level of care was to be lowered from EOP to Correctional Clinic Case Management System (CCCMS), which would result in plaintiff's being moved from the EOP unit to the general population. Plaintiff told Gaerlan that he would prefer to go into protective custody. Gaerlan Decl. ¶ 13 & Attach. 5 (notes of 6/14/04). Gaerlan passed this information on to the correctional counselor. Id. ¶ 14.

Plaintiff attended another UCC/IDTT meeting on June 23, 2004; the chairperson was defendant Vasquez, the senior staff psychologist. Before the meeting, defendant Vasquez talked to the staff psychologists and it was only then that he learned that plaintiff was concerned about his safety as a result of the America's Most Wanted broadcast. Vasquez Decl. ¶ 7. The committee decided to retain plaintiff in the EOP unit for thirty days, until the next committee meeting. Gaerlan Decl. ¶ 14. Vasquez believed that retaining plaintiff in the EOP unit was appropriate because plaintiff had said he felt safe in EOP and he could receive the necessary mental health treatment in the unit. Vasquez Decl. ¶ 9.

Gaerlan saw plaintiff again on July 9. Plaintiff said he was ready to go to CCCMS, but wanted to be transferred to a sensitive needs yard. Gaerlan intended to present this

7

request to the next committee meeting, scheduled for July 22. Gaerlan Decl. ¶ 15 & Attach. 5 (notes of 7/9/04).

Defendant Ventimiglia was the lieutenant for psychiatric services in the EOP unit of A-Facility during March and April 2004. Declaration of Thomas Ventimiglia (Ventimiglia Decl.) ¶ 3. Plaintiff did not tell defendant Ventimiglia of any safety concerns between March and July 2004. Although defendant Ventimiglia reviewed a report of the July 12, 2004 attack on plaintiff, the report contained nothing about the motive for the attack. Id. ¶ 7. He did not learn of the motive for the attack until he chaired the UCC/IDTT meeting on August 19, when the committee decided to transfer plaintiff to a special needs yard at a different prison. Id. ¶ 8.

Defendant Nelson was the correctional sergeant in the EOP unit of A-Facility during March and April 2004. Plaintiff did not tell defendant Nelson that he had any concerns about his safety as a result of the America's Most Wanted broadcast. Declaration of Jeffrey Nelson (Nelson Decl.) ¶¶ 3, 6. Defendant Nelson was on duty on July 12, 2004 when inmate Crossley attacked plaintiff, but Nelson did not know the motive behind the attack. Id. ¶ 7. Nelson saw plaintiff a few days later and plaintiff said he was adding Nelson to his lawsuit because Nelson had been the sergeant on duty at the time of the attack. Id. ¶ 9.

B. Plaintiff's Version of the Facts

Plaintiff avers that he told "every defendant" that his life was in danger and he needed to be isolated because he had been labeled a "snitch" on national television. Taylor Decl. ¶¶ 5, 7, 8. He did not tell defendant Frishman or Gaerlan or any other CDC employee that he felt safe in A-Facility. Id. ¶ 10. Plaintiff avers, however, that he does not know defendant Johnson and did not speak to him on or about March 30, 2004. Id. ¶ 9.

Inmate Crossley, plaintiff's alleged assailant, has submitted a statement, which was attached to the complaint. The statement is not executed under the penalty of perjury, however, and although it appears to qualify as a statement against interest, plaintiff has not demonstrated Crossley's unavailability such that the statement can be considered. Indeed,

plaintiff represents that Crossley "is prepared to testify in this matter in whatever way this Court deems suitable."  Taylor Decl. ¶ 16; cf. Fed. R. Evid. 804(b)(3); Pfingston v. Ronan Engineering Co., 284 F.3d 999, 1004 (9th Cir. 2002).  The court will not consider the statement in resolving the motion for summary judgment.  Nevertheless, defendants do not dispute plaintiff's claim that the attack was motivated by his being identified as an informant.

II. The Eighth Amendment And Inmate Safety

In Farmer v. Brennan, 511 U.S. 825, 833 (1994), the Supreme Court confirmed what the Courts of Appeal had "uniformly held":  "'prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners'" under the Eighth Amendment.  A prison official is not liable, however, "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837.  The Court continued:

> Under the test we adopt today, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of harm.
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of the obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault.  The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health, and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.

Id. at 842-43.  In a footnote, the Court added that a prison official "would not escape liability if the evidence showed he merely refused to verify underlying facts that he strongly suspected to

9

be true, or declined to confirm inferences of risk that he strongly suspected to exist (as when a prison official is aware of a high probability of facts indicating that one prisoner has planned an attack on another but resists opportunities to obtain final confirmation) . . ." Id. at 843 n.8. However, a negligent failure to protect does not violate the Eighth Amendment. Davidson v. Cannon, 474 U.S. 344, 347-48 (1986). The ultimate test is whether the prison official acted reasonably in light of his knowledge; if he did, he is not liable under the Eighth Amendment even if the prisoner is harmed. Farmer, 511 U.S. at 844.

The Ninth Circuit explored the nature of the duty to protect in Berg v. Kincheloe, 794 F.2d 457 (9th Cir. 1986). Berg claimed he had been placed in protective custody because his life was in danger and that he told Marsh, a prison official, he would be in even greater danger if he went to his job as a tier porter. Marsh ignored his protest and sent him to work, where he was beaten and raped. The Ninth Circuit reversed the district court's grant of summary judgment because the pro se complaint, read liberally, stated a prima facie cause of action. The court observed:

> The standard does not require that the guard or official believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before that officer is obligated to take steps to prevent such an assault. But, on the other hand, he must have more than a mere suspicion that an attack will occur.

Id. at 459 (internal citation and quotation omitted).

In Davis v. Scott, 94 F.3d 444, 445-46 (8th Cir. 1996), the plaintiff was placed in protective custody because he had enemies in the general population. When those inmates were transferred, Davis attended a classification committee meeting to determine whether he could return to general population. Davis asked to stay in protective custody but was unable to name specific enemies in that population. His claims about the friends of his enemies who remained in general population "were . . . vague and unsubstantiated." Id. at 447. He was removed from protective custody and later assaulted by an inmate.

/////

The Eighth Circuit held:

> [T]here being no solid evidence here of an identifiable serious risk to Davis's safety, the prison officials were not deliberately indifferent in returning him to the general prison population, and they were entitled to summary judgment.

Id. at 447.

In some cases, however, an inmate's generalized fear, based on his status, may give rise to a duty to protect, whether or not he can or will provide specific information about threats. For example, in Gullatte v. Potts, 654 F.2d 1007 (5th Cir. 1981), the court recognized a prison official who is aware that "snitches" are in danger in general population may have a duty to protect a "snitch," whether or not the inmate provides a "list of potential enemies." Id. at 1013. And in Hamilton v. Leavy, the court recognized

> since Lewis [defendant] should be charged with Hamilton's known cooperation with prison officials and the subsequent branding of Hamilton as a "snitch, . . ., a factfinder could infer that Lewis knew that the threat to Hamilton's safety was imminent.

117 F.3d 742, 747 (3d Cir. 1997). In addition, in Reece v. Groose, 60 F.3d 487, 491 (8th Cir. 1995), the court recognized the "pervasive risk" to an inmate who was known to have testified for the prosecution in a murder case. Finally, in David v. Hill, the court observed:

> Courts have long recognized that being labeled a "snitch" in the prison environment can indeed pose a threat to an inmate's health and safety in violation of the Eighth Amendment.

401 F.Supp.2d 749, 756-57 (S.D. Tex. 2005).

Defendants do not dispute the notion that a prisoner who is known or believed to be a "snitch" may be in danger or the claim that the broadcast of America's Most Wanted suggested that plaintiff had identified his crime partner for the police or prosecution. One group of defendants -- Sichler, Ventimiglia and Nelson -- contends that plaintiff never told them of his safety concerns and they were not otherwise aware that plaintiff had been identified as an informant. DMSJ at 9-10. A second group – Johnson, Vasquez, Gaerlan, Kennedy and

Frishman – contends that plaintiff either did not express any safety concerns or said he felt safe in A-Facility even after the America's Most Wanted segment had aired. Id. at 6-9. In addition, Vasquez describes A-Facility as a place where inmates are "kept in a protected environment and do not experience the same hostile interactions that inmates in general population would experience" and as a place where plaintiff could "receive all appropriate mental health care," which made the determination to leave plaintiff on A-Facility "the best decision for him at the time." Vasquez Decl. ¶¶ 8-9. None of the defendants aver that informants were not or had never been targeted in A-Facility or the EOP unit.

Plaintiff's account is different: he claims that he told all the defendants, except defendant Johnson, that his life was in danger as a result of the broadcast, but that the defendants accused him, in essence, of engaging in hyperbole in order to secure a transfer.

Accordingly, there is a dispute over whether plaintiff informed the defendants that he felt his safety was at risk in A-Facility and whether defendants failed to act until after plaintiff had been stabbed, disputes that preclude summary judgment for either plaintiff or defendants.

III.  Qualified Immunity

Defendants urge that they are entitled to qualified immunity because they acted reasonably by investigating plaintiff's security concerns and holding two hearings, where plaintiff expressed his agreement with the decision to leave him in the A-Facility EOP unit, a safe yard apart from general population.

Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In determining whether a governmental officer is immune from suit based on the doctrine of qualified immunity, the court must answer two questions. The first is, taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? Saucier v. Katz, 533 U.S. 194, 201

(2001). A negative answer ends the analysis, with qualified immunity protecting defendant from liability. Id. In this case, the court has found that, viewing the facts in the light most favorable to plaintiff, there is a constitutional violation.

If a constitutional violation occurred, a court must further inquire "whether the right was clearly established." Id. "If the law did not put the [defendant] on notice that [his] conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Id. at 202. The reasonableness of a defendant's conduct is judged "against the backdrop of the law at the time of the conduct." Brosseau v. Haugen, 543 U.S. 194, 198 (2004).

In Brosseau, the Supreme Court emphasized that "the qualified immunity inquiry must be undertaken in light of the specific context of the case." Id. In that case, the defendant police officer had shot a fleeing felon in the back. Id. at 194. The Court found that case law clearly established that in a case involving excessive force "where the officer has probable cause to believe that the suspect poses a threat of serious physical harm," the outcome depends very much on the specific facts of each case. Id. at 197-98, 201. Therefore, the Court held that because the officer's actions fell "in the 'hazy border between excessive and acceptable force,'" the officer was entitled to qualified immunity. Id. at 201 (internal citation omitted).

An inmate's right to be protected from assault was clearly announced in Farmer v. Brennan, 511 U.S. 825 (1994), if not before. The Courts of Appeals had addressed an inmate's right to personal safety before the Supreme Court made the principle explicit. See, e.g., Berg, 794 F.2d at 459. In addition, the Courts of Appeals had examined prison officials' responses to an inmate who had been labeled an informant. In Reece v. Groose, the Eighth Circuit described

/////
/////
/////
/////
/////

the test for qualified immunity in a failure to protect case:

> [T]he defendants in this case would have qualified immunity if, in the light of all the facts known at the time, they reasonably believed that they had taken proper measures to protect the plaintiff.

60 F.3d at 490. In Reece, the court found that the defendants were not entitled to summary judgment on the grounds of qualified immunity: the risk to Reece was obvious because of the general knowledge that he had been a government witness; while his initial placement in administrative segregation was reasonable, there were disputed questions whether defendants had done enough to protect plaintiff from the inmate who ultimately assaulted him, an inmate with a propensity for violence, "in light of the pervasive risk to Reece." Id. at 491.

Plaintiff has produced enough evidence to raise a question of material fact as to whether defendants took appropriate steps to protect plaintiff given the law at the time of, and shortly proceeding, the attack on plaintiff. There is no dispute that plaintiff was identified as an informant on national television. Defendants' own exhibits undercut their blanket assertions regarding whether they were on notice of the risk to plaintiff, and plaintiff has sworn that he informed the defendants that he was at risk unless he was transferred to protective custody. In light of the "pervasive risk" to an inmate so publicly branded as an informant, the defendants' refusal to respond to plaintiff's expressed fear for his safety – sufficiently established for summary judgment purposes – does not show that defendants' took proper measures for his safety in light of the law as announced in Farmer v. Brennan. Indeed, although defendants Nelson and Ventimiglia assert that plaintiff did not tell them of any safety concerns, they contend that had he done so, they would have placed him in Administrative Segregation until the threat could be verified. Ventimiglia Decl. ¶ 6; Nelson Decl. ¶ 6. At this stage of litigation, the declarations stand as some evidence that the other defendants' responses were not reasonable, if plaintiff's sworn assertion that they were on notice is credited. They are not entitled to qualified immunity.

IT IS HEREBY RECOMMENDED that:

1. Plaintiff's January 23, 2006 motion for summary judgment be denied; and

2. Defendants' September 22, 2006 motion for summary judgment be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: August 10, 2007.

_____
U.S. MAGISTRATE JUDGE

2/tayl1412.157