IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KIRRELL TAYLOR,

                   Plaintiff,                          No. CIV S-05-1412 GEB KJM P

            vs.

MIKE KNOWLES, et al.,

                   Defendants.               FINDINGS & RECOMMENDATIONS

_____/

            Plaintiff is a state prison inmate proceeding pro se with a civil rights action under

42 U.S.C. § 1983, alleging that the defendants failed to protect him after a broadcast of the

program "America's Most Wanted" said that he provided information about his co-perpetrator to

authorities and that, as a result, he was attacked by a razor-wielding inmate on July 12, 2004.

            Defendants and plaintiff have filed cross-motions for summary judgment.

I.  Standards For Summary Judgment Motions

            Summary judgment is appropriate when it is demonstrated that there exists "no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).

/////

/////

1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

> Under summary judgment practice, the moving party
>
> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

1   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

2   return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

3   1436 (9th Cir. 1987).

4              In the endeavor to establish the existence of a factual dispute, the opposing party

5   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

6   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

7   versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

8   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

9   genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

10  committee's note on 1963 amendments).

11             In resolving the summary judgment motion, the court examines the pleadings,

12  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

13  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

14  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

15  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

16  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

17  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

18  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

19  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

20  show that there is some metaphysical doubt as to the material facts. . . . Where the record taken

21  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

22  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

23             On January 10, 2006, the court advised plaintiff of the requirements for opposing

24  a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland,

25  154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999); Klingele v.

26  Eikenberry, 849 F.2d 409 (9th Cir. 1988).

1    II.  Factual Background

2        A.  Defendants' Version of the Facts

3            In 2004, plaintiff was housed in the Enhanced Outpatient (EOP) unit in A-Facility

4    of California State Prison, Sacramento.  Defendants' Motion For Summary Judgment (DMSJ),

5    Declaration of J. Johnson[1] (Johnson Decl.) ¶¶ 3, 5; Declaration of Michael Sichler (Sichler

6    Decl.) ¶ 5.  A-Facility is a protective custody unit, housing inmates with "sensitive needs," such

7    as gang drop outs, mental health patients, or others who might be targeted in general population.

8    Declaration of Michael Vasquez (Vasquez Decl.) ¶ 8.  The EOP unit in A-Facility is a mental

9    health unit, where the inmates are given regular contact with counselors and psychiatrists.

10   Johnson Decl. ¶ 6.  Defendant Gaerlan, a psychologist, was plaintiff's case manager, who met

11   weekly with plaintiff and coordinated plaintiff's treatment.  Declaration of Alvin Gaerlan

12   (Gaerlan Decl.) ¶¶ 4-5.

13           On or about March 20, 2004, the television show "America's Most Wanted" aired

14   an episode that included information about plaintiff's crime and suggested that plaintiff had

15   identified his crime partner to the police.  The next day, other inmates told plaintiff about the

16   broadcast.  Plaintiff's Motion For Summary Judgment (PMSJ), Declaration of Kirell Taylor

17   (Taylor Decl.) ¶¶ 2-3.[2]

18           On March 22, 2004, plaintiff had a routine appointment with defendant Frishman,

19   a staff psychiatrist in the EOP program.  Declaration of Richard Frishman (Frishman Decl.) ¶¶ 6-

20   7.  Plaintiff told Frishman he was concerned because the America's Most Wanted broadcast had

21   claimed plaintiff had informed against his crime partner and said, "I don't know who I'm going

22   to have to stab . . . I'm worried someone is coming after me . . . This is no light matter . . . I can't

23

24           [1]  For ease of reference, the court will describe the declarations by the name of the
     declarant, rather than by their exhibit letter.

25

26           [2]  This is hearsay, but defendants have not objected to it or otherwise contested the
     contention that the broadcast labeled plaintiff a "snitch."

1  sleep." Id. ¶ 7 & Attach. 2 (Progress Notes).  Defendant Frishman's notes describe plaintiff as

2  "paranoid he will be focus of an attack."  Id.  Defendant Frishman avers that plaintiff suffers

3  from a delusional disorder and often described incidents with no basis in reality.  In the past,

4  plaintiff had told Frishman he had millions of dollars buried in Southern California and he had

5  personally attempted to stop the September 11, 2001 terrorist attacks.  Id. ¶ 8.  Frishman initially

6  believed that this account of America's Most Wanted was another delusion.  Id.  Frishman

7  concedes that plaintiff "expressed concern with the airing of the . . . program" but was "unable to

8  point to a specific safety threat."  Id.

9  Plaintiff had a regular weekly meeting with defendant Gaerlan on March 24,

10  2004.  Gaerlan Decl. ¶ 7.  Plaintiff said that other inmates and guards told him the broadcast

11  characterized him as an informant.  Gaerlan describes plaintiff's demeanor as "upset" and "angry

12  and embarrassed" but said plaintiff did not express any safety concerns.  Id. ¶ 7 & Attach. 2

13  (Progress Notes).  Defendant Gaerlan confirmed plaintiff's account by talking to correctional

14  officers who had seen the show, which in fact had claimed plaintiff had turned against his co-

15  perpetrator.  Id. ¶ 8 & Attach. 2.

16  Defendant Johnson was a correctional lieutenant in charge of the EOP in A-

17  Facility during March and April 2004.  Johnson Decl. ¶ 3.  On March 30, 2004,[3] Johnson

18  interviewed plaintiff in order "to evaluate Taylor's status following a televised program of

19  Americas Most Wanted (AMW) that featured him and his commitment offense."  Id. ¶ 8 &

20  Attach. 1.  Plaintiff told Johnson that the show had "inaccurately portrayed him as an informant

21  against his crime partner," but that he felt safe in A-Facility because it "does not play politics."

22  Id. ¶¶ 9-10 & Attach. 1.[4]

23

24  [3]  The declaration gives the date as March 30, 2006, an apparent typographical error.  The court deems the correct date to be March 30, 2004, based on other information in the record.

25  [4]  Attachment 1 to the Johnson Declaration is a memorialization of the interview of
26  March 30.  It notes that plaintiff had approached defendant Kennedy about obtaining a letter from the District Attorney.  Defendant Kennedy, however, describes her meeting with plaintiff

1       Defendant Gaerlan had another meeting with plaintiff on March 30.  Plaintiff

2   reported he had spoken with the facility captain and counselor[5] about the broadcast.  Plaintiff

3   wanted to ensure that the information was documented.  Gaerlan Decl. ¶ 9 & Attach. 3.[6]

4       On March 31, 2004, plaintiff asked to see defendant Kennedy, who was a

5   correctional counselor for the A-Facility EOP unit until May 3, 2004.  Declaration of Patricia

6   Kennedy (Kennedy Decl.) ¶¶ 3-4.  Plaintiff asked Kennedy to contact the District Attorney's

7   office and secure a letter affirming that he had not been an informant in the co-perpetrator's case.

8   Id. ¶ 5.  Plaintiff said he would need the letter if he were moved to B or C Facility, but agreed

9   that general population inmates might not consider such a letter credible.  Id. ¶ 6.  He also told

10  her that he did not have safety concerns in A-Facility, but thought he would be in danger if he

11  were transferred to B or C Facility.  Id. ¶ 7.  Kennedy confirmed that defendant Johnson had

12  interviewed plaintiff the night before and that plaintiff had not expressed any safety concerns to

13  Johnson.  Accordingly, Kennedy took no steps to move plaintiff to another facility.  Id. ¶ 8.

14      On April 1, 2004, plaintiff had a Unit Classification/Interdisciplinary Treatment

15  Team (UCC/IDTT) meeting to consider whether he should remain in EOP or transfer to another

16  unit or prison.  Kennedy Decl. ¶ 9.  Plaintiff agreed with the recommendation that he remain in

17  EOP.  Id., Attach. 1; Gaerlan Decl. ¶ 11 & Attach. 4.  Gaerlaen's notes reflect, however, that

18  Captain Vance had assigned someone "to address the issue of possible safety concern" as a result

19  of the broadcast.  Gaerlan Decl., Attach. 4 (notes of 4/1/04).

20      Plaintiff continued to meet with defendant Gaerlan and occasionally said he was

21  depressed about the broadcast.  Id. ¶ 12 & Attach. 5.  According to Gaerlan's declaration,

22

23  as occurring on March 31, after plaintiff met with Johnson.  Declaration of Patricia Kennedy
    (Kennedy Decl.) ¶ 5.

24      [5] See note 4 supra.

25      [6] In his declaration, Gaerlan claims that plaintiff expressed no concerns about his safety
26  on the EOP unit; this is not reflected in the progress notes.  Compare Gaerlan Decl. ¶ 9 & Attach.
    3.

1   plaintiff never said he was in any danger.  According to the progress notes of April 5, 2004,

2   however, plaintiff told Gaerlan, "Someone is after me and wants me to die"; also on April 19,

3   2004, plaintiff told Gaerlan that "he believes there is someone who wants him dead, but he

4   doesn't know who," though this person might have been a correctional officer.  Compare

5   Gaerlan Decl. ¶ 12 & Attach. 5 (notes of 4/5/04 & 4/19/04).  In addition, plaintiff met with

6   defendant Frishman on three other occasions before July 12, but did not express any concerns for

7   his safety.  Frishman Decl. ¶ 9 & Attach. 3.

8         Defendant Sichler replaced defendant Kennedy as correctional counselor in the

9   EOP unit on May 3, 2004.  Sichler Decl. ¶ 3.  Plaintiff did not tell Sichler he had any concerns

10   about his safety.  Sichler learned of the America's Most Wanted broadcast only after plaintiff

11   was attacked on July 12.  Id. ¶¶ 6, 8.

12         On June 21, 2004, staff determined that plaintiff's level of care was to be lowered

13   from EOP to Correctional Clinic Case Management System (CCCMS), which would result in

14   plaintiff's being moved from the EOP unit to the general population.  Plaintiff told Gaerlan that

15   he would prefer to go into protective custody.  Gaerlan Decl. ¶ 13 & Attach. 5 (notes of 6/14/04).

16   Gaerlan passed this information on to the correctional counselor.  Id. ¶ 14.

17         Plaintiff attended another UCC/IDTT meeting on June 23, 2004; the chairperson

18   was defendant Vasquez, the senior staff psychologist.  Before the meeting, defendant Vasquez

19   talked to the staff psychologists and it was only then that he learned that plaintiff was concerned

20   about his safety as a result of the America's Most Wanted broadcast.  Vasquez Decl. ¶ 7.  The

21   committee decided to retain plaintiff in the EOP unit for thirty days, until the next committee

22   meeting.  Gaerlan Decl. ¶ 14.  Vasquez believed that retaining plaintiff in the EOP unit was

23   appropriate because plaintiff had said he felt safe in EOP and he could receive the necessary

24   mental health treatment in the unit.  Vasquez Decl. ¶ 9.

25         Gaerlan saw plaintiff again on July 9.  Plaintiff said he was ready to go to

26   CCCMS, but wanted to be transferred to a sensitive needs yard.  Gaerlan intended to present this

1   request to the next committee meeting, scheduled for July 22.  Gaerlan Decl. ¶ 15 & Attach. 5

2   (notes of 7/9/04) .

3          Defendant Ventimiglia was the lieutenant for psychiatric services in the EOP unit

4   of A-Facility during March and April 2004.  Declaration of Thomas Ventimiglia (Ventimiglia

5   Decl.) ¶ 3.  Plaintiff did not tell defendant Ventimiglia of any safety concerns between March

6   and July 2004.  Although defendant Ventimiglia reviewed a report of the July 12, 2004 attack on

7   plaintiff, the report contained nothing about the motive for the attack.  Id. ¶ 7.  He did not learn

8   of the motive for the attack until he chaired the UCC/IDTT meeting on August 19, when the

9   committee decided to transfer plaintiff to a special needs yard at a different prison.  Id. ¶ 8.

10          Defendant Nelson was the correctional sergeant in the EOP unit of A-Facility

11   during March and April 2004.  Plaintiff did not tell defendant Nelson that he had any concerns

12   about his safety as a result of the America's Most Wanted broadcast.  Declaration of Jeffrey

13   Nelson (Nelson Decl.) ¶¶ 3, 6.  Defendant Nelson was on duty on July 12, 2004 when inmate

14   Crossley attacked plaintiff, but Nelson did not know the motive behind the attack.  Id. ¶ 7.

15   Nelson saw plaintiff a few days later and plaintiff said he was adding Nelson to his lawsuit

16   because Nelson had been the sergeant on duty at the time of the attack.  Id. ¶ 9.

17          B.  Plaintiff's Version of the Facts

18          Plaintiff avers that he told "every defendant" that his life was in danger and he

19   needed to be isolated because he had been labeled a "snitch" on national television.  Taylor Decl.

20   ¶¶ 5, 7, 8.  He did not tell defendant Frishman or Gaerlan or any other CDC employee that he felt

21   safe in A-Facility.  Id. ¶ 10.  Plaintiff avers, however, that he does not know defendant Johnson

22   and did not speak to him on or about March 30, 2004.  Id. ¶ 9.

23          Inmate Crossley, plaintiff's alleged assailant, has submitted a statement, which

24   was attached to the complaint.  The statement is not executed under the penalty of perjury,

25   however, and although it appears to qualify as a statement against interest, plaintiff has not

26   demonstrated Crossley's unavailability such that the statement can be considered.  Indeed,

1    plaintiff represents that Crossley "is prepared to testify in this matter in whatever way this Court

2    deems suitable."  Taylor Decl. ¶ 16; cf. Fed. R. Evid. 804(b)(3); Pfingston v. Ronan Engineering

3    Co., 284 F.3d 999, 1004 (9th Cir. 2002).  The court will not consider the statement in resolving

4    the motion for summary judgment.  Nevertheless, defendants do not dispute plaintiff's claim that

5    the attack was motivated by his being identified as an informant.

6    II.  The Eighth Amendment And Inmate Safety

7                In Farmer v. Brennan, 511 U.S. 825, 833 (1994), the Supreme Court confirmed

8    what the Courts of Appeal had "uniformly held":  "'prison officials have a duty . . . to protect

9    prisoners from violence at the hands of other prisoners'" under the Eighth Amendment.  A prison

10   official is not liable, however, "unless the official knows of and disregards an excessive risk to

11   inmate health or safety; the official must both be aware of facts from which the inference could

12   be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id.

13   at 837.  The Court continued:

14                 Under the test we adopt today, an Eighth Amendment claimant
                   need not show that a prison official acted or failed to act believing
15                 that harm actually would befall an inmate; it is enough that the
                   official acted or failed to act despite his knowledge of a substantial
16                 risk of harm.

17                 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

18                 Nor may a prison official escape liability for deliberate
                   indifference by showing that, while he was aware of the obvious,
19                 substantial risk to inmate safety, he did not know that the
                   complainant was especially likely to be assaulted by the specific
20                 prisoner who eventually committed the assault.  The question
                   under the Eighth Amendment is whether prison officials, acting
21                 with deliberate indifference, exposed a prisoner to a sufficiently
                   substantial 'risk of serious damage to his future health, and it does
22                 not matter whether the risk comes from a single source or multiple
                   sources, any more than it matters whether a prisoner faces an
23                 excessive risk of attack for reasons personal to him or because all
                   prisoners in his situation face such a risk.
24

25   Id. at 842-43.  In a footnote, the Court added that a prison official "would not escape liability if

26   the evidence showed he merely refused to verify underlying facts that he strongly suspected to

                                                    9

be true, or declined to confirm inferences of risk that he strongly suspected to exist (as when a prison official is aware of a high probability of facts indicating that one prisoner has planned an attack on another but resists opportunities to obtain final confirmation) . . ." Id. at 843 n.8. However, a negligent failure to protect does not violate the Eighth Amendment. Davidson v. Cannon, 474 U.S. 344, 347-48 (1986). The ultimate test is whether the prison official acted reasonably in light of his knowledge; if he did, he is not liable under the Eighth Amendment even if the prisoner is harmed. Farmer, 511 U.S. at 844.

The Ninth Circuit explored the nature of the duty to protect in Berg v. Kincheloe, 794 F.2d 457 (9th Cir. 1986). Berg claimed he had been placed in protective custody because his life was in danger and that he told Marsh, a prison official, he would be in even greater danger if he went to his job as a tier porter. Marsh ignored his protest and sent him to work, where he was beaten and raped. The Ninth Circuit reversed the district court's grant of summary judgment because the pro se complaint, read liberally, stated a prima facie cause of action. The court observed:

> The standard does not require that the guard or official believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before that officer is obligated to take steps to prevent such an assault. But, on the other hand, he must have more than a mere suspicion that an attack will occur.

Id. at 459 (internal citation and quotation omitted).

In Davis v. Scott, 94 F.3d 444, 445-46 (8th Cir. 1996), the plaintiff was placed in protective custody because he had enemies in the general population. When those inmates were transferred, Davis attended a classification committee meeting to determine whether he could return to general population. Davis asked to stay in protective custody but was unable to name specific enemies in that population. His claims about the friends of his enemies who remained in general population "were . . . vague and unsubstantiated." Id. at 447. He was removed from protective custody and later assaulted by an inmate.

/////

1      The Eighth Circuit held:

2      [T]here being no solid evidence here of an identifiable serious risk
3      to Davis's safety, the prison officials were not deliberately
      indifferent in returning him to the general prison population, and
4      they were entitled to summary judgment.

5   <u>Id</u>. at 447.

6      In some cases, however, an inmate's generalized fear, based on his status, may

7   give rise to a duty to protect, whether or not he can or will provide specific information about

8   threats.  For example, in <u>Gullatte v. Potts</u>, 654 F.2d 1007 (5th Cir. 1981), the court recognized a

9   prison official who is aware that "snitches" are in danger in general population may have a duty

10   to protect a "snitch," whether or not the inmate provides a "list of potential enemies." <u>Id</u>. at

11   1013.  And in <u>Hamilton v. Leavy</u>, the court recognized

12      since Lewis [defendant] should be charged with Hamilton's known
      cooperation with prison officials and the subsequent branding of
13      Hamilton as a "snitch, . . ., a factfinder could infer that Lewis knew
      that the threat to Hamilton's safety was imminent.
14

15   117 F.3d 742, 747 (3d Cir. 1997).  In addition, in <u>Reece v. Groose</u>, 60 F.3d 487, 491 (8th Cir.

16   1995), the court recognized the "pervasive risk" to an inmate who was known to have testified

17   for the prosecution in a murder case.  Finally, in <u>David v. Hill</u>, the court observed:

18      Courts have long recognized that being labeled a "snitch" in the
      prison environment can indeed pose a threat to an inmate's health
19      and safety in violation of the Eighth Amendment.

20   401 F.Supp.2d 749, 756-57 (S.D. Tex. 2005).

21      Defendants do not dispute the notion that a prisoner who is known or believed to

22   be a "snitch" may be in danger or the claim that the broadcast of America's Most Wanted

23   suggested that plaintiff had identified his crime partner for the police or prosecution.  One group

24   of defendants -- Sichler, Ventimiglia and Nelson -- contends that plaintiff never told them of his

25   safety concerns and they were not otherwise aware that plaintiff had been identified as an

26   informant.  DMSJ at 9-10.  A second group – Johnson, Vasquez, Gaerlan, Kennedy and

Frishman – contends that plaintiff either did not express any safety concerns or said he felt safe in A-Facility even after the America's Most Wanted segment had aired. Id. at 6-9. In addition, Vasquez describes A-Facility as a place where inmates are "kept in a protected environment and do not experience the same hostile interactions that inmates in general population would experience" and as a place where plaintiff could "receive all appropriate mental health care," which made the determination to leave plaintiff on A-Facility "the best decision for him at the time." Vasquez Decl. ¶¶ 8-9. None of the defendants aver that informants were not or had never been targeted in A-Facility or the EOP unit.

Plaintiff's account is different: he claims that he told all the defendants, except defendant Johnson, that his life was in danger as a result of the broadcast, but that the defendants accused him, in essence, of engaging in hyperbole in order to secure a transfer.

Accordingly, there is a dispute over whether plaintiff informed the defendants that he felt his safety was at risk in A-Facility and whether defendants failed to act until after plaintiff had been stabbed, disputes that preclude summary judgment for either plaintiff or defendants.

III.  Qualified Immunity

Defendants urge that they are entitled to qualified immunity because they acted reasonably by investigating plaintiff's security concerns and holding two hearings, where plaintiff expressed his agreement with the decision to leave him in the A-Facility EOP unit, a safe yard apart from general population.

Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In determining whether a governmental officer is immune from suit based on the doctrine of qualified immunity, the court must answer two questions. The first is, taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? Saucier v. Katz, 533 U.S. 194, 201

1   (2001).  A negative answer ends the analysis, with qualified immunity protecting defendant from

2   liability.  Id.  In this case, the court has found that, viewing the facts in the light most favorable

3   to plaintiff, there is a constitutional violation.

4          If a constitutional violation occurred, a court must further inquire "whether the

5   right was clearly established."  Id.  "If the law did not put the [defendant] on notice that [his]

6   conduct would be clearly unlawful, summary judgment based on qualified immunity is

7   appropriate."  Id. at 202.  The reasonableness of a defendant's conduct is judged "against the

8   backdrop of the law at the time of the conduct."  Brosseau v. Haugen, 543 U.S. 194, 198 (2004).

9          In Brosseau, the Supreme Court emphasized that "the qualified immunity inquiry

10  must be undertaken in light of the specific context of the case."  Id.  In that case, the defendant

11  police officer had shot a fleeing felon in the back.  Id. at 194.  The Court found that case law

12  clearly established that in a case involving excessive force "where the officer has probable cause

13  to believe that the suspect poses a threat of serious physical harm," the outcome depends very

14  much on the specific facts of each case.  Id. at 197-98, 201.  Therefore, the Court held that

15  because the officer's actions fell "in the 'hazy border between excessive and acceptable force,'"

16  the officer was entitled to qualified immunity.  Id. at 201 (internal citation omitted).

17         An inmate's right to be protected from assault was clearly announced in Farmer v.

18  Brennan, 511 U.S. 825 (1994), if not before.  The Courts of Appeals had addressed an inmate's

19  right to personal safety before the Supreme Court made the principle explicit.  See, e.g., Berg,

20  794 F.2d at 459.  In addition, the Courts of Appeals had examined prison officials' responses to

21  an inmate who had been labeled an informant.  In Reece v. Groose, the Eighth Circuit described

22  /////

23  /////

24  /////

25  /////

26  /////

1  the test for qualified immunity in a failure to protect case:

2          [T]he defendants in this case would have qualified immunity if, in
3          the light of all the facts known at the time, they reasonably
           believed that they had taken proper measures to protect the
4          plaintiff.

5  60 F.3d at 490.  In <u>Reece</u>, the court found that the defendants were not entitled to summary

6  judgment on the grounds of qualified immunity: the risk to Reece was obvious because of the

7  general knowledge that he had been a government witness; while his initial placement in

8  administrative segregation was reasonable, there were disputed questions whether defendants

9  had done enough to protect plaintiff from the inmate who ultimately assaulted him, an inmate

10 with a propensity for violence, "in light of the pervasive risk to Reece."  <u>Id</u>. at 491.

11         Plaintiff has produced enough evidence to raise a question of material fact as to

12 whether defendants took appropriate steps to protect plaintiff given the law at the time of, and

13 shortly proceeding, the attack on plaintiff.  There is no dispute that plaintiff was identified as an

14 informant on national television.  Defendants' own exhibits undercut their blanket assertions

15 regarding whether they were on notice of the risk to plaintiff, and plaintiff has sworn that he

16 informed the defendants that he was at risk unless he was transferred to protective custody.  In

17 light of the "pervasive risk" to an inmate so publicly branded as an informant, the defendants'

18 refusal to respond to plaintiff's expressed fear for his safety – sufficiently established for

19 summary judgment purposes – does not show that defendants' took proper measures for his

20 safety in light of the law as announced in <u>Farmer v. Brennan</u>.  Indeed, although defendants

21 Nelson and Ventimiglia assert that plaintiff did not tell them of any safety concerns, they

22 contend that had he done so, they would have placed him in Administrative Segregation until the

23 threat could be verified.  Ventimiglia Decl. ¶ 6; Nelson Decl. ¶ 6.  At this stage of litigation, the

24 declarations stand as some evidence that the other defendants' responses were not reasonable, if

25 plaintiff's sworn assertion that they were on notice is credited.  They are not entitled to qualified

26 immunity.

IT IS HEREBY RECOMMENDED that:

1. Plaintiff's January 23, 2006 motion for summary judgment be denied; and

2. Defendants' September 22, 2006 motion for summary judgment be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  August 10, 2007.

_____
U.S. MAGISTRATE JUDGE

2/tayl1412.157